JOURNAL ENTRY AND OPINION
This is an appeal from a conviction following a jury trial before Judge Nancy R. McDonnell. Clifton Wells claims his convictions for felonious assault and aggravated burglary should be reversed and remanded because they were against the weight of the evidence, and because a police officer improperly vouched for the credibility of the victim. We affirm.
From the record we glean the following: On November 5, 2000, then thirty-four-year-old Earl Crooks was at his home in South Euclid with Ramona Watkins, alternately referred to as his goddaughter or stepdaughter.[1] Watkins was using a speaker phone to talk with a friend, Charice Woods, and Crooks, who also knew her, got involved in the conversation and apparently offended Woods with a statement about her unborn child, and she hung up.
A short time later Woods arrived at Crooks' home, used her cell phone to ask him for permission to enter, and he refused. Wells, then age twenty-one, who was Woods' boyfriend and the father of her unborn child, entered Crooks' unlocked apartment without permission and walked upstairs, accompanied by two men. After a short conversation the three men beat Crooks with their fists and a baseball bat and then Wells ordered him to go outside and apologize, both to Woods and to "Pooky," the unborn child. When Crooks complied, his assailants left, Watkins made a 911 call and an ambulance took Crooks to the hospital, where he was treated for a dislocated shoulder, in addition to cuts and bruises.
Crooks and Watkins gave written statements to the South Euclid police on November 25, 2000, and December 7, 2000, respectively, each identifying a man called "Suga" as Woods' boyfriend and the primary assailant. Watkins' statement claimed that she heard Suga's voice, that she heard Crooks and Suga arguing over the comments made to Woods and, that when she emerged from the bathroom, she saw Suga and three other men beating Crooks. But for the fact that Crooks identified only two other men and Watkins identified three, their statements were consistent. Both Watkins and Crooks subsequently identified Wells as "Suga," and he was indicted for aggravated burglary and felonious assault.
At trial Wells claimed that Crooks had been beaten in a drug-related incident, and had intentionally misidentified him as his attacker. He attacked Crooks' credibility, eliciting an admission that he was on probation for marijuana possession and suggesting that he was under the influence of alcohol or drugs at the time of the attack. Crooks' alcohol use was less an issue than was his credibility; he denied using alcohol, and Wells attempted to show the opposite in order to impeach him.
The State contended that Watkins had been uncooperative prior to trial, and the judge agreed to call her as a court's witness under Evid.R. 614(A), without objection from Wells. Watkins recanted her written statement, which corroborated Crooks' version of events, and instead testified that she did not see Wells among the men who attacked Crooks in the apartment. She admitted, however, that she heard Wells' voice in the apartment prior to walking out of the bathroom and seeing the attack, and she saw Wells outside the apartment with Woods when Crooks was taken downstairs. Her recantation continued to place him at the scene but denied any knowledge of whether Wells had physically participated in the attack.
The State also presented testimony from police detective Stephen McGraw, who investigated the attack and took the written statements from Crooks and Watkins. He testified that he had both witnesses repeat their stories several times in order to ensure their accuracy and consistency and, when asked why he asks witnesses to repeat statements, testified that "[a] person will remember the truth forever." Wells objected to the remark, and the judge sustained the objection but did not instruct the jury to disregard the statement, and Wells did not request that the jury be so instructed or that the judge strike the remark.
The jury found Wells guilty on both counts, and he was sentenced to two concurrent four-year prison terms, to run consecutive to a one-year term imposed for a community control sanction violation. The judge also notified Wells that, "you will be subject to post release control," although she gave no further specification of that part of his sentence.
The first of Wells' three assignments of error states:
 I. THE STATE OF OHIO, THROUGH ITS WITNESS IMPROPERLY VOUCHED FOR THE VERACITY OF THE VICTIM EARL CROOKS.
Wells argues that Detective McGraw's statement that "[a] person will remember the truth forever" was an improper attempt to vouch for the credibility of Crooks' statement and testimony. He also points to a later part of McGraw's testimony where he stated that Crooks had signed his written statement, indicating "that that statement was true[.]"
As noted, the judge sustained Wells' objection to the first statement, although she did not strike the remark or instruct the jury to disregard it. Wells, however, did not object to the second statement, and his failure to request a limiting instruction with respect to the first waived all but plain error and, as discussed further infra, such error cannot be shown because it is not outcome determinative.[2] Even if the jury disbelieved Crooks' testimony, Watkins' testimony was sufficient to convict Wells as a participant under R.C. 2923.03, because she placed him at the scene of the crime under circumstances suggesting his complicity in the attack, if not his outright direction of it. The jury was instructed on complicity, and the evidence pointed to Wells' involvement even if one accepted the strained version of events set forth in Watkins' testimony.
The more troubling aspect of McGraw's testimony, which Wells has not specifically discussed, are his admissions that he had both Crooks and Watkins repeat their stories several times in order to assess their consistency, and that they did consistently repeat the facts of their stories. In fact, nearly all of McGraw's testimony appears objectionable as irrelevant, as hearsay, or as an improper attempt to bolster the credibility of a witness or, in Watkins' case, a witness's written statement. The witness statements themselves were not admissible for other than impeachment purposes,[3] yet McGraw was allowed to testify not only about the contents of the written statements,[4] but to the contents of the witnesses' oral statements as well.
On direct examination, he testified that he was assigned to investigate the crime, that he had been unable to contact Crooks, and that Crooks eventually contacted him to make a statement. He then discussed Crooks' explanation of his failure to contact him earlier, which was objectionable as hearsay but went unchallenged. McGraw then described the interview at which he took Crooks' statement, first stating that Crooks' speech is naturally slurred because he has some type of impediment. This might have been the only admissible portion of the testimony, as it was offered to counteract a medical record that referred to his slurred speech and stated that he had been drinking before the attack.
He next stated that Crooks consistently repeated the facts contained in his statement two or three times during the interview. Not only did the reference to his statement plainly refer to evidence and testimony introduced earlier, McGraw then discussed the specifics of Crooks' statements during the interview. This testimony was inadmissible as hearsay or as a direct and improper attempt to bolster Crooks' credibility.
McGraw then gave the same type of testimony about Watkins' statement, testifying that she repeated her story consistently "four or five times" before signing her written statement. Although Wells unsuccessfully objected to this instance of "consistency" testimony at trial, he has not argued the point on appeal. McGraw also discussed the specifics of Watkins' statement, particularly her identification of Wells as the perpetrator.
Finally, and apparently gratuitously, McGraw was allowed to testify that he interviewed Wells while in custody, that he informed him of his right to remain silent,[5] and that he instructed Wells that he had to make his own decision whether to waive that right. The testimony was irrelevant and insidious because he never testified that Wells did or did not make any further statement. The prosecutor simply asked McGraw an unrelated question after eliciting the fact that he had informed Wells of his Miranda rights, obliquely yet unmistakably leaving the impression that Wells had invoked his right to remain silent. The testimony had no proper purpose, and should have been excluded.[6] Nevertheless, although Wells objected to this testimony prior to it being offered, it was introduced without objection in its watered-down, although still irrelevant and prejudicial form, after an unrecorded sidebar discussion, and he has not raised the issue on appeal.
Despite these errors, which raise issues of prosecutorial misconduct as well as erroneously admitted evidence, we find the lack of adequate objection and assignment on appeal renders them irremediable except for plain error.[7] Because Watkins' testimony was itself sufficient to convict Wells as a participant in the attack, we cannot say that the introduction of McGraw's testimony was outcome determinative.[8] We note, however, that it is disturbing to see this type of evidence offered and received in a courtroom when it appears, as here, that it was calculated rather than spontaneous, and where it was utterly unnecessary. We take a dim view of trial misconduct in all its forms and in all cases, and affirm here only because the circumstances and evidence are so starkly against Wells. The first assignment of error is overruled.
The second assignment states:
 II. THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
A manifest weight challenge entails review of the persuasive value of evidence, the credibility of witnesses, and the strength of inferences that can be drawn from that evidence in order to determine whether the jury's verdict was reasonable under all the circumstances.[9] We review the evidence to determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[10]
Wells contends that the jury "lost its way" because he alleges Crooks' testimony was substantially different from that in his written statement, and Watkins admitted that, because Crooks threatened her, and she lied to police when she gave her written statement. He failed, however, to specify the substantial differences between Crooks' testimony and his statement, other than a minor disparity in his recollection of the attack itself.
Crooks testified that Wells walked behind him while the other men approached from the front, and that Wells tripped him as he tried to reach his phone, and then began punching him, while in his statement he claimed only that Wells walked behind him and punched him in the back of the head. Neither this nor any other challenge to Crooks' credibility was of such a stunning or ubiquitous nature that we would find a jury could not believe his testimony.
On the other hand, Watkins' recantation of her statement was made under circumstances indicating a motive to fabricate testimony; she admitted that she was friendly with Woods, and that Crooks had recently evicted her from his home. Moreover, her recantation was inconsistent, at times incoherent, and ultimately incomplete. Although at trial she denied seeing Wells participate in the beating, she admitted hearing his voice in the apartment just before the attack, arguing with Crooks, and to seeing him outside the apartment with Crooks and Woods. Although the jury reasonably could have credited Crooks' testimony over that of Watkins, it also could have convicted Wells for the acts of the other men even if it believed Watkins' testimony, because the evidence sufficiently and credibly showed his presence and complicity in the attack.[11] The jury did not clearly lose its way when it found him guilty. The second assignment is overruled.
Wells' third assignment states:
 III. CUMULATIVE ERRORS DEPRIVED THE APPELLANT OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL.
Wells argues that the cumulative effect of the manifest weight challenge coupled with the prosecutorial misconduct requires reversal. We agree that manifest weight review, which assesses the quality, credibility, and persuasive value of the evidence in its totality, requires that we consider the effect of any erroneously admitted evidence or argument, and thus that the impropriety alleged in the first assignment of error should be considered in the manifest weight determination. Wells in fact raised the issue in his manifest weight challenge, arguing that Crooks' testimony would not have been believed, and the guilty verdict not returned, without Detective McGraw's improper remarks. Having considered the issue in the second assignment of error, we nonetheless found the jury had not clearly lost its way, and so overruled the challenge. There is no need to reconsider it here. The third assignment of error is overruled.
Judgment affirmed.
It is ordered that the appellee recover from appellant costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
COLLEEN CONWAY COONEY, J., CONCURS IN JUDGMENT ONLY; JAMES D. SWEENEY,P.J., CONCURS IN JUDGMENT ONLY WITH SEPARATE OPINION.
[1] The relationship between Crooks and Watkins is unclear, but Watkins testified that her mother sent her to live with him approximately four years earlier, after her mother was sentenced to prison.
[2] State v. Underwood (1978), 3 Ohio St.3d 12, 3 OBR 360,444 N.E.2d 1332, syllabus. Current law can sometimes be construed to require only a showing that the outcome was "affected," but still requires showing that the error resulted in a "manifest miscarriage of justice." State v. Barnes (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240,1247, citations omitted.
[3] See, e.g., State v. York (1996), 115 Ohio App.3d 245, 247-248,685 N.E.2d 261, 263-264 (witness statement is not part of public report under Evid.R. 803(8) unless witness has duty to speak).
[4] We also note that no limiting instruction was requested or accompanied the use of either witness's statement for impeachment purposes. Particularly, extensive portions of Watkins' written statement were introduced without limitation.
[5] Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694.
[6] See, e.g., Doyle v. Ohio (1976), 426 U.S. 610, 617-618,96 S.Ct. 2240, 2244-2245, 49 L.Ed.2d 91, 97-98 (post-Miranda silence cannot be used to impeach testifying defendant).
[7] Underwood, supra.
[8] Id.
[9] State v. Martin (1983), 20 Ohio App. 172, 175, 20 OBR 415,485 N.E.2d 717, 720-21.
[10] Id.
[11] R.C. 2923.03.